UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

USA,

Plaintiff,

v.

CRUZ HERNANDEZ et al.,

FERNANDO GARCIA PARADA (4)
EDGARD VELASQUEZ (8)
JOSE JONATHAN CASTILLO (26)

Defendants.

Case No. 2:19-CR-00117-SB

ORDER DENYING MOTIONS FOR ACQUITTAL AND NEW TRIALS [DKT. NOS. 3068, 3061, 3062, 2969]

A jury convicted Defendants Jose Jonathan Castillo, Fernando Garcia Parada, Edgard Velasquez, and Angel Amadeo Guzman of murder in aid of racketeering activity on behalf of Mara Salvatrucha (MS-13), a criminal enterprise. The jury also convicted Garcia, Velasquez, and Guzman of participating in a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO). Defendants now move for judgments of acquittal or new trials.[1] For the reasons explained below, the motions are denied.

I.

The following facts are drawn from the trial evidence, viewed in the light most favorable to the verdicts under Rule 29 and independently weighed to determine whether the interest of justice requires a new trial under Rule 33. Fed. R. Crim. P. 29(c), 33(a).

[1] The Court does not address Guzman's motion because his hearing has been continued but discusses his conduct as relevant to the other defendants' motions.

A.

MS-13, also known as Mara Salvatrucha, is a transnational criminal organization with members operating in the United States, El Salvador, and other countries. The gang fosters a strong collective identity through distinctive symbols, rituals, and traditions. Members adopt gang monikers, display identifying hand signs, use coded language, and observe shared customs that distinguish them from outsiders and reinforce their allegiance to the organization. Loyalty, obedience, and willingness to engage in violence are central to MS-13's culture. Members are expected to follow gang rules, participate in criminal activities, and demonstrate their commitment to the organization.

In Los Angeles, MS-13 operates through subgroups known as "cliques." Although each clique has its own members, leadership, and territory, the cliques share a common hierarchy and rules governing membership and criminal activity. Each clique is led by a "corredor," or shot caller, who directs its activities, enforces discipline, and exercises authority over its members. With minor variations, prospective members progress through ranks known as "paro," "observacion," and "chequeo" before becoming full members, or "homeboys." Advancement requires performing "work" for the gang, including criminal acts, and the evidence showed that becoming a homeboy generally required committing a murder and undergoing a 13-second initiation beating.

Murder serves vital objectives for MS-13. Participation in gang-related killings demonstrates commitment to the enterprise, earns respect and standing within the gang, and provides an opportunity for promotion to homeboy. Murders also enforce gang rules, punish perceived disloyalty and other violations, intimidate rivals and potential informants, and reinforce MS-13's reputation for violence. By requiring members to participate in such acts, MS-13 strengthens the members' allegiance to the enterprise and maintains its authority both within and outside the gang.

MS-13 members also engage in drug trafficking, extortion, and other crimes to generate income and advance the enterprise's interests. Members are expected to obey orders and participate in criminal activities, with violations punishable by severe sanctions, including death. Through its hierarchical structure, continuing membership, and coordinated criminal activity, MS-13 operates as an organized criminal enterprise.

B.

Castillo, Velasquez, Garcia, and Guzman were highly committed members of MS-13.

Castillo, known by the moniker Little Diabolico, was an established member of MS-13's Francis clique. He regularly associated with members of his own and other MS-13 cliques and openly identified himself as a gang member. The evidence showed that he exercised influence in matters involving enforcement of MS-13's membership rules and participated in coordinating activities with other cliques. His conduct reflected adherence to the gang's hierarchy, its rules governing membership and loyalty, and its expectation that established members would enforce those rules through violence.

Velasquez, known by the moniker Snoopy, was an established MS-13 member and leader of the Fulton clique, exercising authority over its members and activities. He directed the clique's operations, including drug distribution, collection of proceeds, acquisition of firearms, and enforcement of gang rules. At a meeting with Fulton members, he emphasized their obligation to demonstrate loyalty through criminal activity, including murder, and explained the requirements for advancement within the gang. He also communicated with MS-13 leadership in El Salvador and exercised authority over decisions concerning violence. His leadership reflected a sustained commitment to maintaining the clique's discipline, strengthening its membership, and advancing MS-13's interests.

Garcia, known by the moniker Caprichoso, was an active member of the Fulton clique who progressed to homeboy status. He associated regularly with other Fulton members and participated in gang activities. His involvement extended beyond his own clique to activities involving members of other MS-13 cliques. The evidence showed that Garcia understood the gang's rules, participated in enforcing them, and accepted responsibilities assigned to established members. His continued participation after attaining homeboy status reflected an ongoing commitment to maintaining his standing and supporting the enterprise.

Guzman, known by the moniker Splinter, was an established Fulton homeboy who exercised substantial authority over younger members and served as an intermediary between them and Velasquez. He supervised gang activities, including drug distribution and collection of proceeds, instructed members to defend Fulton territory, and encouraged violence against rivals. He also communicated with members of other MS-13 cliques, conveyed decisions

concerning enforcement of gang rules, and directed younger members in carrying out those decisions. His activities demonstrated his commitment to the gang's hierarchy, its expectations of violence, and the advancement of its interests.

C.

The principal homicides at issue are the murders of J.S., G.B., and E.H.[2] The three murders shared the hallmarks of MS-13 violence: collective planning and execution, brutal punishment for perceived violations of gang rules, and the expectation that members would participate in killings to demonstrate loyalty and maintain or advance their positions within the gang.

1.

J.S. was murdered on March 6, 2017 for violating MS-13 rules. J.S. previously had associated with the Fulton clique as a paro but became a target after violating gang rules by distancing himself from the clique, using prohibited drugs, and associating with a member of the rival 18th Street gang.

Following consultation with Velasquez, the clique announced a "green light" authorizing the murder of J.S. On March 6, Fulton members, including Garcia and Guzman, encountered J.S. near Whitsett Park, within the clique's territory. Knowing of the green light, they engaged him in friendly conversation while arranging to take him to a more secluded area in the Angeles National Forest, known as the "Too Late Helipad," where he could be killed. Guzman and Garcia then accompanied J.S. to another MS-13 gathering place, a riverbed known as "the wash," where the group attacked and strangled him until he lost consciousness.

The group then transported J.S. to the Angeles National Forest. Guzman traveled with J.S. and others in one vehicle, while Garcia and his fellow co-conspirators traveled up the mountain in another vehicle. Once there, Guzman directed the group to remove J.S. from the vehicle and carry him to the Too Late Helipad. Garcia, Guzman, and other gang members then attacked J.S. with a machete. Guzman also cut open J.S.'s chest and removed his heart. The participants threw J.S.'s remains down the mountainside and disposed of their clothing.

[2] The victims' names are referred to by their initials to protect their identities.

At trial, the defense contended that J.S. was already dead when the machete attack began, pointing to evidence that he earlier had been strangled unconscious, was carried or dragged to the mountaintop, and was not heard speaking there by cooperating witnesses. But a rational jury could find that J.S. was still alive when the attack began. Most significantly, Garcia told an undercover informant, whom he believed to be a fellow gang member, that J.S. was transported alive to the mountain, regained consciousness after being struck in the face, and pleaded not to be hurt. This account was corroborated by testimony that J.S. made gurgling sounds during the attack and that his body had not stiffened, as well as medical evidence of sharp-force injuries inflicted around the time of death.

2.

On April 20, 2017, MS-13 members murdered G.B., also known as Charcan, because they suspected him of cooperating with law enforcement in El Salvador and leaving the country without the gang's permission.

After MS-13 leadership authorized the killing, members of the Directos Locos clique enlisted the assistance of Defendant Guzman and other Fulton members. Guzman consulted Fulton leader Velasquez and obtained permission to participate. The group devised a plan to lure G.B. to a secluded location by using the Facebook account of a teenage girl to arrange a purported date. Guzman helped select the murder location—the same remote area of the Angeles National Forest where MS-13 members had previously killed J.S.

On the morning of the murder, Guzman joined other participants who picked up G.B. and drove him to the Angeles National Forest. Unaware of the plan, G.B. accompanied the group to a clearing where other MS-13 members were waiting. Guzman approached G.B. from behind and struck him in the head with a pistol, knocking him to the ground. Other participants then struck G.B. repeatedly with a large rock or piece of concrete, and the group, including Guzman, attacked him with knives and a machete. After killing G.B., the participants removed his clothing, applied rubbing alcohol to his body to conceal evidence, and disposed of his remains over the hillside.

3.

On June 4, 2017, MS-13 members murdered E.H., also known as "Winnie Pooh," because he falsely claimed to be a full member, or homeboy, of MS-13 in violation of the gang's rules.

Members of the Park View clique investigated his claimed status and determined that he was not a homeboy. They then arranged to bring E.H. to a Francis clique gathering place in Koreatown known as a "destroyer," where members of the Francis, Fulton, and Park View cliques assembled. There, E.H. was surrounded and interrogated about his gang membership. During the interrogation, one member punched him, knocking him to the ground. Although the group initially discussed giving E.H. a "correction," or disciplinary beating, the members ultimately decided to kill him. The killing would punish E.H. for violating MS-13's rules and provide participating members an opportunity to earn credit toward advancement within the gang. Defendant Castillo, a Francis homeboy, participated in the discussions about E.H.'s fate. Defendant Garcia and another Fulton member, Carabina, identified the Too Late Helipad in the Angeles National Forest—the site of J.S.'s earlier murder—as a suitable location and directed the others to follow them there.

The group transported E.H. to the Angeles National Forest without revealing their intention to kill him. Upon reaching the parking area near the Too Late Helipad, the members discussed their respective roles. Garcia and Carabina remained near the vehicles to watch for approaching traffic, while Castillo and other gang members escorted E.H. up a dirt path to a secluded clearing. Castillo directed E.H. to lie on the ground and prevented him from getting up when the attack began. The group then repeatedly stabbed and struck E.H. with bladed weapons, including a machete, with multiple members participating in the killing. Castillo personally joined the attack, including efforts to decapitate E.H. Afterward, the participants threw his body over the hillside.

D.

In January 2024, the government filed the fourth superseding indictment, charging Defendants and 16 co-conspirators with various offenses, including racketeering conspiracy under 18 U.S.C. § 1962(d) and murder in aid of racketeering (VICAR murder) under 18 U.S.C. § 1959(a). Dkt. No. 1013. Defendants proceeded to trial in May 2026, during which the government presented substantial evidence, including numerous cooperating witnesses who participated in MS-13 and the VICAR murders.[3] The jury convicted: Garcia, Velasquez, and Guzman of racketeering conspiracy; Castillo and Garcia of the VICAR murder of E.H.; Defendants Garcia, Velasquez, and Guzman of the

[3] To protect their identities, cooperating witnesses are identified by the acronym "CW" (for cooperating witness) followed by a letter (e.g., CW-A).

VICAR murder of J.S.; and Defendant Guzman of the VICAR murder of G.B. Dkt. Nos. 2806, 2808, 2810, 2812. Defendants now move for judgments of acquittal or, alternatively, new trials.

II.

Defendants challenge their convictions and seek judgments of acquittal or new trials under Rules 29 and 33. These motions are governed by distinct standards, and the challenges to the VICAR murder convictions implicate both direct and aiding-and-abetting liability.

Under Rule 29, a district court may set aside a verdict and enter judgment of acquittal if, viewing the evidence in the light most favorable to the government, no rational juror could have found the essential elements beyond a reasonable doubt. *United States v. Niebla-Torres*, 847 F.3d 1049, 1054 (9th Cir. 2017); Fed. R. Crim. P. 29. Conflicting evidence must be resolved in favor of the jury verdict, and all reasonable inferences must be drawn in favor of the government. *United States v. Corona-Verbera*, 509 F.3d 1105, 1117 (9th Cir. 2007). In assessing a Rule 29 motion, a court "cannot second-guess the jury's credibility assessments." *United States v. Nevils*, 598 F.3d 1158, 1170 (9th Cir. 2010) (en banc).

Rule 33 permits broader review but imposes a demanding standard for relief. Under Rule 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial should be granted "only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (cleaned up). The decision is within the "sound discretion" of the district court. *United States v. Steel*, 759 F.2d 706, 715 (9th Cir. 1985).

These standards govern Defendants' challenges to their VICAR murder convictions. For those convictions, the government could prove guilt under either a direct or aiding-and-abetting theory. To prove direct liability, the government had to prove that (1) MS-13 Los Angeles existed and engaged in racketeering activity at the relevant time; (2) the defendant committed intentional murder with malice aforethought; and (3) the defendant acted to gain entrance to, maintain, or increase his position in MS-13 Los Angeles. Dkt. No. 2793 at 25–26. Alternatively, the government could establish aiding-and-abetting liability by proving that (1) another person committed VICAR murder; (2) the defendant assisted with at least one element of the offense; (3) he intended to facilitate VICAR murder; and (4) he acted before its completion. *Id.* at 26–27. The

government did not have to establish which theory applied to each defendant. *Id.* at 27.

III.

Defendant Castillo was convicted of the VICAR murder of E.H. and moves for judgment of acquittal under Rule 29, challenging the sufficiency of the evidence of VICAR purpose. Dkt. No. 2969. The motion lacks merit.

The government presented substantial evidence from which a rational jury could find that Castillo participated in the murder, at least in substantial part, to maintain or increase his position within MS-13. The evidence supported the conclusion that E.H. was murdered for falsely claiming gang membership and to enforce MS-13's rules through violence. CW-U testified that gang members interrogated E.H. about his membership, that Castillo was among those conducting the interrogation, and that the homeboys subsequently discussed his fate before announcing that he would be punished. 5-13 Tr. at 45:6–48:17. CW-U also described MS-13's enforcement practices, including the use of a "green light" to authorize a killing, and testified that clique leaders (corredores) oversaw gang activities and determined promotions. *Id.* at 18:11–16, 20:14–20, 30:7–24; *see also* 5-20 Tr. at 30:1–40:4 (CW-L discussing MS-13 structure and operation). After the decision to kill E.H., Castillo participated in discussing where to take him, directed him to lie on the ground, prevented him from getting up, and stabbed him. 5-13 Tr. at 50:2–17, 62:2–63:14; 5-14 Tr. at 141:16–19. The jury also heard testimony that homeboys had continuing responsibilities to demonstrate the gang's practices, including violence, to lower-ranking members. *E.g.,* 6-1 Tr. at 82:17–22; 5-13 Tr. at 100:3–14. Taken together, this evidence permitted the jury to infer that Castillo participated in enforcing MS-13's rules to satisfy the gang's expectations and preserve his standing within the enterprise.

Under *United States v. Banks*, 514 F.3d 959, 970–71 (9th Cir. 2008), the government was not required to prove that Castillo expected or received a promotion. It was enough to show that a substantial purpose of his participation in the murder was to maintain his reputation or meet the gang's expectations. *Id.* at 971; *see also United States v. Rodriguez*, 971 F.3d 1005, 1011–12 (9th Cir. 2020) (upholding a VICAR conviction where the defendant's conduct was inextricably tied to her position in the enterprise). The jury reasonably could infer that purpose from Castillo's role in planning and carrying out the murder to enforce MS-13's membership rules. Although Castillo suggested at trial that another participant was motivated by jealousy, there was no evidence that Castillo shared that motive.

Castillo's remaining arguments do not warrant acquittal. His challenges to the cooperating witnesses' credibility, the corroboration of their testimony, and the significance of his statements to an undercover informant do not undermine the sufficiency of the evidence but instead challenge the weight of the evidence and the inferences reasonably drawn from it.[4] The evidence supporting the verdict was substantial, and the Court may not reweigh it or second-guess the jury's credibility determinations under Rule 29. *Nevils*, 598 F.3d at 1169–70. Nor does his asserted prejudice from the joint trial undermine the sufficiency of the individualized evidence connecting him to the murder. Because a rational jury could find the elements of VICAR murder beyond a reasonable doubt, on a theory of either direct or aider-and-abettor liability, the motion is denied.

IV.

Defendant Garcia Parada was convicted of the VICAR murders of J.S. and E.H. Dkt. No. 2808. He moves for judgment of acquittal on the VICAR murder of E.H. under Rule 29 or, alternatively, for a new trial under Rule 33. He also moves for a new trial on the VICAR murder of J.S. under Rule 33. Dkt. No. 3068.

A.

Like Castillo, Garcia argues that there was insufficient evidence to sustain his conviction for the VICAR murder of E.H. His arguments focus on (1) whether he aided in committing the murder and (2) whether he acted with the requisite VICAR purpose.

1.

The jury heard evidence from which it could reasonably find that Garcia knowingly and intentionally assisted in E.H.'s murder. Garcia was present when

---

[4] At the hearing, Castillo argued for the first time that the government mischaracterized CW-R's testimony as identifying him as the Francis clique's leader, relying on the interpreter's correction of "The leader, Diabolico of Francis" to "Little Diabolico from Francis." 5-14 Tr. at 105:18–20 ("Apologies from the interpreter, Little Diabolico from Francis."). It is unclear whether the correction concerned only Castillo's moniker or also his identification as a leader. But the distinction is immaterial because the government was not required to prove that Castillo held a leadership position to establish his VICAR purpose, which was independently supported by substantial evidence.

the group was informed that E.H. would be killed. 5-13 Tr. at 49:3–17. He then helped identify a location for the killing—the same location where he had previously participated in J.S.'s murder—and directed others to follow him there. *Id*. at 50:2–21. Once there, Garcia participated in the discussion assigning roles for the murder, *id.* at 58:10–17, and he agreed to remain near the vehicles to watch for approaching traffic while others carried out the killing, *id.* at 60:7–16. The jury could reasonably infer from these coordinated acts that Garcia intentionally facilitated the murder, even though he did not personally attack E.H. or accompany the killers up the trail.

Garcia argues that he initially believed E.H. would receive only a 13-second beating and, upon learning that E.H. would be killed, remained behind because he did not want to participate. He relies on testimony that, during the homeboys' discussion of E.H.'s fate, someone announced that E.H. would receive a "13" and that the beating would have to occur elsewhere because of the noise. *See* 5-14 Tr. at 130:18–132:9. But the evidence also showed that, after this announcement and before taking E.H. to the mountaintop, Garcia was present when the chequeos were told that E.H. would be killed, and that this was "[their] opportunity to become homeboys." 5-13 Tr. at 49:3–17. His decision to remain near the parked vehicles, below the murder site, was consistent with serving as a lookout rather than withdrawing from the murder.

Viewing that evidence in the government's favor, a rational jury could find that Garcia knew E.H. would be killed and intentionally assisted by helping select the murder site, leading the group there, and undertaking a surveillance role while the killing occurred. Neither his failure to attack E.H. personally nor the absence of evidence that he actually warned the killers of approaching traffic precluded a finding that he aided and abetted the murder.

2.

Garcia also argues that the government failed to prove the requisite VICAR purpose because he was already a homeboy, whereas the E.H. murder offered chequeos an opportunity to attain that status. But VICAR does not require a promotion or proof that maintaining or increasing gang status was the defendant's sole or primary motive. *Banks*, 514 F.3d at 965, 970–71. The jury heard evidence that MS-13 expected homeboys to participate in gang violence, that additional murders earned respect, and that E.H. was killed for falsely claiming homeboy status. From this evidence and Garcia's assistance in carrying out the killing, the

jury could reasonably infer that maintaining his position in MS-13 was a substantial purpose of his participation.

The evidence also supported VICAR purpose under an aiding-and-abetting theory. That theory required proof that another participant committed the murder with the requisite VICAR purpose and that Garcia knew of that purpose and intended to facilitate the VICAR murder. *See United States v. Manning*, 2025 WL 2408915, at *2 (9th Cir. Aug. 20, 2025) (unpublished). The evidence that the murder was undertaken to enforce MS-13's membership rules and promote participating chequeos, coupled with Garcia's knowledge of the plan and assistance in carrying it out, permitted the jury to find both requirements satisfied. His existing homeboy status did not compel a different conclusion.

Because the evidence supports a guilty verdict for the VICAR murder of E.H., the Court denies Garcia's motion for judgment of acquittal.

B.

Garcia alternatively seeks a new trial under Rule 33 on the VICAR murder conviction of E.H. Having independently considered the evidence, the Court finds that it does not weigh against the verdict, much less heavily so. *See Pimentel*, 654 F.2d at 545.

Garcia first argues that a new trial is warranted because only one witness—CW-U—provided testimony linking him to the E.H. murder, and that the testimony was not credible. But several aspects of CW-U's testimony were corroborated, including cell-site records consistent with his traveling up and down the mountain at the time of the murder and Facebook messages between Garcia and a co-conspirator hours after the murder referring to the "piñata." Garcia wrote to Paola Guevara: "It's crazy that you even joined in on the piñata too." 5-19 Tr. at 50:18–19. Another witness testified that "piñata" was code for an assault or murder. 5-28 Tr. at 39:6–12. Based on all the evidence, including CW-U's testimony, the Court finds that the evidence does not weigh heavily against Garcia's conviction for the VICAR murder of E.H.

Garcia next argues that the prosecutor mischaracterized the evidence during rebuttal closing argument by misstating which co-conspirator helped Garcia identify the murder location and attributing to Garcia an admission that he and Guevara committed the murder together. Although the prosecutor may have misstated certain details, the evidence supported the central points that Garcia helped identify the location and that his Facebook messages implicated him in the

killing. In any event, given the substantial evidence of guilt, the absence of a contemporaneous objection, and the Court's instruction that counsel's arguments are not evidence, Garcia has not shown misconduct warranting a new trial. *See United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996).

Accordingly, the Court denies Garcia's motion for a new trial on his conviction for the VICAR murder of E.H.

C.

Garcia also seeks a new trial under Rule 33 for the VICAR murder of J.S. His primary defense at trial was that J.S. died at the wash, before Garcia and others attacked him with machetes at the mountain. Although Garcia told an undercover informant that J.S. was transported alive, he maintains that the statement was false. Garcia claims that four categories of errors impaired his defense: (1) an undisclosed expert opinion by Dr. Kevin Young, a mischaracterization of that opinion in closing argument, and improper restrictions on his cross-examination; (2) improper statements during the government's rebuttal closing argument about Garcia's participation in the strangulation; (3) exclusion of the factual basis for CW-I's guilty plea; and (4) restrictions on his cross-examination of Detective Herman Frettlohr. Each category is discussed below.

1.

Garcia objects to Dr. Young's testimony about the timing of J.S.'s injuries for lack of pretrial disclosure. This untimely objection is without merit. Dr. Young testified that a fracture of J.S.'s humerus was "perimortem," meaning that it occurred around the time of death—"[n]ormally" within minutes, although it could be "hours." 5-27 Tr. at 161:22–162:8. Garcia argues that this was an undisclosed expert opinion. But Dr. Young's disclosed autopsy report identified the fracture as perimortem (Dkt. No. 3128-1), and his testimony merely explained that term. He did not determine when J.S. died or precisely when the fracture occurred. Garcia has not shown a disclosure violation or prejudice.

Garcia also contends that the government mischaracterized Dr. Young's testimony in closing argument.[5] In its initial closing, the government argued that

---

[5] Garcia also argues that the government improperly shifted the burden of proof by noting his failure to call an expert to rebut Dr. Young. But a prosecutor may comment on the defense's failure to present rebuttal evidence without shifting the burden of proof, *see United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir.

J.S.'s bone fracture occurred within minutes of death. Garcia responded that the prosecutor had not told "the whole story" because Dr. Young also testified that a perimortem injury could occur hours after death. In rebuttal, the prosecutor asserted that Dr. Young had specified an "outer limit[]" of a "couple of hours." 6-2 Tr. at 162:6–9. Because Garcia did not object, the remarks are reviewed for plain error. *United States v. Flores*, 802 F.3d 1028, 1037 (9th Cir. 2015). Although the rebuttal overstated Dr. Young's testimony, Garcia has not shown prejudice warranting relief. The Court instructed the jury that counsel's arguments were not evidence, and Garcia's counsel read Dr. Young's actual testimony acknowledging that the injury could have occurred hours after death. 6-2 Tr. at 144:22–145:19. Moreover, the government did not rely solely on Dr. Young's testimony, citing other evidence that J.S. was alive when the machete attack began, including Garcia's statements to an undercover informant. *See id*. at 25:1–27:7.

Garcia further challenges the Court's restrictions on his cross-examination of Dr. Young about whether strangulation could cause loss of bowel control and observable signs of rigor mortis. But those questions extended beyond Dr. Young's direct examination concerning the injuries to J.S.'s remains. *See* Fed. R. Evid. 611(b). Moreover, Garcia elicited testimony that Dr. Young could not determine the cause of death, could not rule out strangulation, and acknowledged that the observed injuries could have occurred after death. 5-27 Tr. at 169:18–171:15. The jury also heard evidence that J.S. had lost bowel control, which Garcia used in closing to argue that J.S. died at the wash. *See* 6-2 Tr. at 142:2–14. Garcia therefore had a meaningful opportunity to present his theory.

2.

Garcia next argues that the government committed misconduct by asserting for the first time in rebuttal that Garcia restrained J.S. at the wash. The government responds that it did not argue that Garcia physically restrained J.S., but rather that his presence helped prevent J.S. from escaping. Dkt. No. 3128 at 19. Although the prosecutor's argument was inartful, viewed in context, he did not suggest that mere presence established aiding-and-abetting liability. Rather, the prosecutor argued that Garcia's participation in the coordinated attack helped prevent J.S. from escaping, even if he did not personally strike him. *See* 6-2 Tr. at 165:11–166:10. That was a permissible inference from the evidence that Garcia knew J.S. had received a green light, helped lure him to the wash, and joined the

---

2000), particularly where, as here, he expressly acknowledges that the defense bore no burden, 6-2 Tr. at 162:10–15.

group that surrounded and attacked him. Moreover, Garcia did not object to the argument and has not shown prejudice warranting relief under plain-error review. Accordingly, Garcia has not established prosecutorial misconduct warranting a new trial.

3.

Garcia next argues that a new trial is warranted because the Court excluded part of the factual basis for CW-I's guilty plea. The plea agreement stated, "To the extent [J.S.] was already dead before entering defendant's car . . . ." Garcia sought to introduce this language as a government acknowledgment that J.S. may have died at the wash. Although statements in plea agreements may qualify as government admissions, they remain subject to Rule 403. Fed. R. Evid. 403; *see United States v. Mirabal*, 98 F.4th 981, 987 n.4 (9th Cir. 2024). Here, the Court excluded the language because its probative value was substantially outweighed by the risks of unfair prejudice and juror confusion. 6-1 Tr. at 18:4–19:7. The conditional language did not concede when J.S. died; it merely left that question unresolved because it was immaterial to CW-I's plea. Admitting it risked misleading jurors into treating a drafting qualification as a government concession and would have required evidence about the plea negotiations to explain its meaning. *Id.* Nor has Garcia established that any error was prejudicial, as required to disturb the verdict. *See United States v. Lopez*, 4 F.4th 706, 717–19 (9th Cir. 2021). Garcia presented his theory that J.S. died at the wash through other evidence and argument, and substantial evidence supported his conviction even if J.S. died there.

4.

Garcia challenges the Court's hearsay rulings during his cross-examination of Detective Herman Frettlohr. Garcia sought to elicit third-party statements suggesting that J.S. died at the wash, ostensibly to explain the course of the investigation rather than prove their truth. But the statements had little probative value apart from their truth. The fact that investigators considered whether J.S. died at the wash did not establish that he died there. Moreover, Garcia elicited that very point without introducing the statements themselves: Frettlohr acknowledged that investigators sought to determine whether J.S. died from strangulation at the wash or machete strikes in the mountains. 5-22 Tr. at 84:20–85:5. Thus, Garcia presented any legitimate investigative-purpose evidence without the risk that jurors would improperly rely on third-party statements for their truth. *See United States v. Johnson*, 875 F.3d 1265, 1278–79 (9th Cir. 2017) (recognizing the distinction

between statements offered for their truth and those offered to explain investigative conduct). The Court therefore properly sustained the hearsay objections. In any event, Garcia has not shown prejudice warranting a new trial.

* * *

In sum, Garcia has failed to identify any prejudicial error and failed to show that the evidence "preponderates heavily against the verdict." *Pimentel*, 654 F.2d at 545. The Court therefore denies his motion for a new trial on the VICAR murder of J.S.

V.

Defendant Edgard Velasquez moves for judgment of acquittal under Rule 29 or, alternatively, a new trial under Rule 33 for the VICAR murder of J.S., including the jury's finding that he committed first-degree murder. Dkt. Nos. 3061, 3062. His principal contention is that the government failed to prove he authorized J.S.'s murder. He also challenges the government's closing argument, testimony about the practices of other MS-13 cliques, the asserted departure from the indictment's allegations, and the denial of severance. The motions are denied for the reasons below.

A.

In moving for judgment of acquittal under Rule 29 for the VICAR murder of J.S., Velasquez argues that the government failed to prove he authorized J.S.'s murder because no witness personally observed him give the order and the cooperating witnesses' accounts were inconsistent and unreliable.

But the evidence, viewed in the light most favorable to the verdict, permitted a rational jury to find otherwise. CW-U testified that, before the murder, Guzman announced that J.S. had received a green light after consulting with Velasquez and other senior Fulton members. 5-13 Tr. at 17:19–18:7. CW-N testified that Guzman subsequently identified Velasquez as the person who authorized the killing. 5-28 Tr. at 106:14–18, 136:16–137:3. Their accounts were corroborated by circumstantial evidence: witnesses identified Velasquez as the Fulton clique's corredor or principal shot caller; recordings documented his participation in communications with MS-13 leadership in El Salvador and meetings of shot callers from various cliques; testimony established that MS-13's protocols generally required leadership approval for planned murders; telephone records reflected communications between Velasquez and Guzman surrounding J.S.'s murder; and

evidence showed that Velasquez subsequently reviewed photographs of the killing and approved promotions for participants.

Velasquez's challenges to the witnesses' inconsistent statements, cooperation incentives, and lack of firsthand knowledge of the authorization conversation go to the credibility and weight of the evidence, not its legal sufficiency. Nor did evidence that other senior members could authorize murders preclude a finding that Velasquez authorized this one. The jury was entitled to credit CW-U and CW-N, draw reasonable inferences from the corroborating evidence, and reject Velasquez's competing interpretation. *See Nevils*, 598 F.3d at 1169–70.

The motion for acquittal is therefore denied.

B.

Velasquez alternatively seeks a new trial on the VICAR murder of J.S. under Rule 33. He challenges the government's closing argument, several evidentiary rulings, and the denial of severance.

1.

In closing argument, the government characterized Guzman's statement to CW-N that Velasquez authorized the murder as an adoptive admission, arguing that Guzman made the statement in Velasquez's presence and Velasquez did not object. 6-2 Tr. at 29:2–7. Velasquez disputes that he was present when Guzman made the statement.

Although the evidence established that Velasquez met with Guzman, it did not clearly establish whether he was present when Guzman told CW-N that Velasquez had authorized the murder. The government's characterization of Velasquez's silence as an adoptive admission therefore rested on a questionable inference. Because Velasquez did not object at trial to that characterization during closing argument, the challenged argument is subject to plain-error review. Even assuming the argument was improper, however, a new trial would not be warranted under either plain-error review or the more favorable standard applicable to a preserved objection. The argument was brief, the jury was instructed that counsel's arguments were not evidence, and CW-U independently testified that Guzman had consulted Velasquez and other senior members before the murder. That testimony was corroborated by the circumstantial evidence discussed above, including Velasquez's leadership role and MS-13's approval practices.

Additionally, Velasquez does not challenge CW-N's testimony as to Guzman's statement. Given this evidence, the Court is not persuaded that the challenged argument materially affected the verdict, much less that it affected Velasquez's substantial rights. Nor does the argument, considered in the context of the trial as a whole, warrant a new trial in the interests of justice.

2.

Velasquez next challenges testimony from CW-L, CW-M, and CW-H concerning the role of corredores in authorizing murders. He argues that their testimony concerned other MS-13 cliques and murders unrelated to J.S., rendering it irrelevant, unfairly prejudicial, and violative of due process. Having objected only on speculation grounds to CW-L's testimony about authorization of murders, Velasquez did not preserve his present evidentiary objections. 5-20 Tr. at 57:6–14. Although plain-error review therefore applies, the objections fail even under the standard applicable to preserved errors.

The testimony was properly admitted. Evidence of MS-13's leadership structure, rules, and practices for authorizing murders was relevant to the existence and operation of the criminal enterprise, the roles and authority of its members, and whether Velasquez, as the Fulton clique's corredor, authorized J.S.'s murder. Fed. R. Evid. 401. The challenged witnesses testified that corredores in other MS-13 cliques exercised authority over planned murders. Their accounts were consistent with testimony from Los Angeles Fulton members. CW-U testified that the corredor had final authority over whether a rule violation warranted death, 5-12 Tr. at 183:24–184:7, and CW-K testified that lower-ranking members had to consult the corredor before issuing a green light, 5-26 Tr. at 76:11–18. CW-N likewise identified Velasquez as corredor, although he acknowledged that other senior members could authorize killings. 5-28 Tr. at 70:2–17. Thus, the testimony concerning other cliques corroborated Fulton's leadership practices without establishing that Velasquez's approval was required for every murder. Nor was its probative value substantially outweighed by unfair prejudice. Fed. R. Evid. 403. The witnesses described their own experiences, not uncharged misconduct by Velasquez, and the jury heard evidence distinguishing the cliques and their practices.[6]

---

[6] Velasquez also invokes Rules 404(b) and 702. But CW-L testified from personal experience as a corredor in Maryland, not as an expert offering an opinion about Velasquez or the Los Angeles Fultons. Nor was his testimony offered to establish

In any event, Velasquez has not shown that the challenged testimony materially affected the verdict. CW-U and CW-N independently identified Velasquez as having authorized J.S.'s murder, and their accounts were supported by the circumstantial evidence discussed above. The testimony about other cliques reinforced the evidence of MS-13's leadership practices but was not necessary to establish Velasquez's authorization. Considering the testimony individually and collectively, the Court finds no evidentiary error or resulting prejudice warranting a new trial, much less a fundamentally unfair trial in violation of due process.[7]

3.

Velasquez's remaining arguments do not warrant a new trial.

First, Velasquez renews his claim that the government constructively amended the indictment or created a prejudicial variance by relying on evidence that he authorized J.S.'s murder before the killing rather than during the telephone call alleged in the indictment. The Court previously rejected this argument. Dkt. No. 2813. The indictment alleged that Velasquez exercised authority over the Fulton clique and approved J.S.'s murder, and the government presented evidence supporting those allegations. Its decision not to present evidence of the particular telephone call did not change the charged offense or materially alter the theory of culpability. Nor has Velasquez established prejudicial surprise or an inability to present his defense. His renewed arguments about the grand jury proceedings and the government's decision not to call CW-I provide no basis to revisit the prior ruling.

Second, Velasquez argues that severance was required because Castillo's defense—that murders required approval from a clique's shot caller—undermined Velasquez's position that he did not authorize J.S.'s murder. Castillo, a member of the Francis clique charged with E.H.'s murder, argued that MS-13 required leadership approval for killings and that the government had not shown he obtained such approval. 5-12 Tr. at 116:3–19; 6-2 Tr. at 96:10–97:8. Although

---

Velasquez's criminal propensity through other acts attributed to him. Neither rule required exclusion.

[7] Although Velasquez argues that testimony about brutal Maryland murders unfairly associated him with those crimes, the testimony did not attribute those murders to him, and the jury heard extensive evidence distinguishing the participants and circumstances of the charged offenses. The risk of unfair association did not substantially outweigh the testimony's probative value.

that argument supported the government's evidence concerning MS-13's approval practices, it neither implicated Velasquez personally nor required a finding that he authorized J.S.'s murder. The defenses were therefore not mutually exclusive. Even if they were, mutually antagonistic defenses do not require severance absent a serious risk that a joint trial would compromise a specific trial right or prevent a reliable determination of guilt. *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993). Velasquez has not shown such prejudice.

Finally, Velasquez contends that the challenged argument, testimony about other cliques, asserted variance, and denial of severance cumulatively violated due process and rendered the trial unfair. But the claimed variance and severance errors have not been established, and the challenged testimony was properly admitted. The government's questionable adoptive-admission argument, considered together with the other challenged matters, did not materially undermine the fairness of the proceedings. Nor does the Court find, after independently considering the weight of the evidence, that the verdict represents a miscarriage of justice. The Court therefore concludes that neither cumulative error nor the interests of justice warrant a new trial.

The Rule 33 motion is denied.

VI.

The Court denies Castillo's motion for judgment of acquittal and Garcia's and Velasquez's motions for acquittal or new trials.

Date: October 21, 2026

Stanley Blumenfeld, Jr.
United States District Judge